The UNITED STATES of America for the Use and Benefit of CLARK–FONTANA PAINT COMPANY, INC. and Clark Paint and Wallcovering, Inc., Plaintiffs,

v.

WIBCO, INC., and Reliance Insurance Company, Defendants.

Civ. A. No. 75–0057.

United States District Court, District of Columbia.

June 24, 1975.

**1254**

Sebert H. Keiffer, Oxon Hill, Md., for plaintiffs.

John F. Costello, Silver Spring, Md., for defendants.

## MEMORANDUM OPINION AND ORDER

GESELL, District Judge.

This case presents the issue of whether a supplier of materials to a government contractor may allocate payments made "on account" but arising out of the government job to other outstanding obligations of the contractor and sue the surety on the government project for the unpaid balance under the Miller Act, 40 U.S.C. § 270b. The matter was tried to the Court without a jury and the parties were given the opportunity to file post-trial briefs arguing the law. This Memorandum Opinion states the Court's findings of fact and conclusions of law.

The evidence showed that as of January 1, 1973, Robert Lowry, doing business under the trade name of WIBCO Painting Co., owed a total of $34,450.75 on open account to use-plaintiff Clark-Fontana Paint Co. Lowry determined to bid on a large G.S.A. contract for painting a number of government buildings, most of them located in the Northern Virginia suburbs of Washington, D. C.* In order to bid on the job, Lowry was required to incorporate and obtain a responsible surety on a payment bond for the benefit of subcontractors. Obtaining a surety presented some difficulty and eventually Lowry took one Robert Curtis into the business. A corporation, WIBCO, Inc., was formed with Lowry as President and Curtis as Secretary-Treasurer, which bid and won the job. A bond was obtained and Curtis subsequently personally indemnified the bonding company.

In arranging for Clark-Fontana to continue to supply WIBCO's needs for materials, both Lowry and Curtis had discussions with Clark-Fontana's President, Reginald Clark. During these discussions they specifically explained that Clark-Fontana would be protected by the payment bond on the government job, that a new corporation had been formed, and that Curtis had been brought into the business to "supply new capital" to make possible the new work. It was not shown that Clark was ever told that Curtis was in essence personally liable on the payment bond by virtue of his indemnification agreement with the bonding company.

Clark agreed to continue to supply paint to the venture. His books never distinguished between Lowry's old unincorporated WIBCO Painting Co. and the new WIBCO, Inc. Clark-Fontana simply carried a running open account in the name of WIBCO Painting Co. Between

---

* Defendants moved to dismiss on the grounds that venue in the District of Columbia was improper since it was not the district "in which the contract was to be performed," 40 U.S.C. § 270b. This position was abandoned at trial when it developed that a small portion of the work was uncontestedly performed in the District. U. S. Fidelity & Guaranty Co. v. McNulty Bros., 13 F.2d 78 (1st Cir. 1926); cf. F. D. Rich Co. v. Industrial Lumber Co., 417 U.S. 116, 124–26, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974). No request to transfer was made although the matter was informally raised by the Court.

January, 1973, and May, 1974, WIBCO purchased a total of $32,448.68 from Clark-Fontana attributable to the G.S.A. contract and an additional $37,033.57 attributable to other jobs. Throughout this period Clark-Fontana showed on the monthly statements to WIBCO, Inc. the outstanding balance carried over from Lowry's WIBCO Painting Co. and WIBCO never protested this practice. Invoices indicated the job for which the paint was supplied, but no effort was made to allocate payments among the jobs.

During this same period, WIBCO made total payments to Clark-Fontana in the amount of $85,382.73, which were sufficient to reduce the aggregate indebtedness from $34,450.75 carried over from Lowry's WIBCO Painting Co. in January, 1973 to $18,550.27 in May, 1974, when payments ceased. All checks from WIBCO to Clark-Fontana bore simply the notation "on account" or no notation at all and were credited to reducing the running balance in the account. Of the $85,382.73 in payments, $66,000 was attributable to proceeds of the G.S.A. contract, although there was no indication that Clark was made aware of the source of each individual payment.

On March 31, 1975, counsel for Clark-Fontana sent a letter to WIBCO purporting to allocate the payments received on account in such a fashion as to satisfy entirely the pre-existing debt carried over from Lowry's WIBCO Painting Co. and the non-governmental work which had been contemporaneous with the G.S.A. contract. This allocation, if effective, left the entire $18,550.-27 balance to be satisfied out of the payment bond on the G.S.A. job.

The March 31 letter came well after this suit was filed on January 14, 1975, and after WIBCO had answered, asserting (¶ 6) that "materials purchased for projects other that [sic] GSA Contract #GS–00B–01165 were charged to this contract by complaintant [sic]." There was vague testimony that the allocation had been made sometime in 1974; however, no notice was given WIBCO until the March, 1975, letter and Clark-Fontana's books and documents do not reflect the allocation.

The parties are in agreement that the law relating to allocation of payments in Miller Act cases has been summarized by Judge, later Justice, Blackmun in *St. Paul Fire & Marine Ins. Co.* v. *United States for the Use of Dakota Elect. Supply Co.*, 309 F.2d 22, 25 (8th Cir. 1962):

(i) The payment is applied as the debtor intends and so manifests to the creditor before or at the time of the payment.

(ii) If the debtor fails so to indicate, the payment is applied as the creditor, within a reasonable time, determines.

(iii) If neither the debtor nor the creditor seasonably so indicates, the payment is applied as a just regard to its effect upon the debtor, the creditor, and third persons makes it desirable that it should be applied. This usually results in its application to the oldest unsecured account.

(iv) If the debtor is under a duty to a third person to devote funds paid by him to the discharge of a particular debt, the payment must be so applied if the creditor knows or has reason to know of that duty. This is so despite the debtor's contrary direction.

*See also*, A.L.I., *Restatement (I) of the Law of Contracts*, §§ 387, 388, 394 (1932); *United States for the Use of Hyland Elect. Supply Co.* v. *Franchi Bros. Const. Co.*, 378 F.2d 134 (2d Cir. 1967); *United States for the Use of C. H. Benton, Inc.* v. *Roelof Const. Co.*, 418 F.2d 1328 (9th Cir. 1969).

■ No issue as to (i), *supra*, arises since WIBCO forwarded all checks "on account" or without notation. As to (ii) the Court is of the opinion that the purported allocation by the creditor contained in the March 31, 1975, letter was not made "within a reasonable time" and therefore is ineffective. Comment h to *Restatement (I) of Contracts*, *supra*, § 387 at 734, states that although what length of time is reasonable varies with

## 1256

the circumstances, "Generally an application after a controversy has arisen between the parties regarding the matter is not within a reasonable time." Plaintiff has failed to prove with credible evidence an effective allocation prior to the March, 1975, letter which was written in contemplation of the issues raised in this lawsuit.

Thus the issue turns on whether Clark-Fontana had "reason to know" that a substantial portion of the payments came from the government job. Lacking such "reason to know," it was entitled to apply payment to the oldest unpaid bills. Although Clark did not know the source of each individual payment, he did know in a general way of the surety's obligation on the government job and at least "had reason to know" that a substantial portion of the payments made to him derived from its proceeds. *Cf. United States for the Use of C. H. Benton, Inc. v. Roelof Const. Co., supra,* 418 F.2d at 1329–30.

In any case, when it ultimately emerges that the payments came from a source intended to exonerate the surety (and in this case the personal indemnitor who stands behind the institutional surety), the equities favor the court allocating the payments to fulfill this implicit purpose, even if the creditor had no knowledge of it, where there has been no effective allocation and no detrimental reliance by the creditor. Indeed, this is precisely the rule recognized in *Restatement (I) of Contracts, supra,* § 394, illustration 3 at 745.

Those courts which assert in dicta that a knowledge requirement may be imposed do so both in the case when the debtor directs the payment to be made to a different obligation, and where there is no direction of any kind by either party. *See, e. g., United States for the Use of Crane Co. v. Johnson, Smathers & Rollins,* 67 F.2d 121, 123–24 (4th Cir. 1933); *St. Paul Fire & Marine Ins. Co. v. United States for the Use of Dakota Elect. Supply Co., supra.* While it may well be sound to require that the creditor "have reason to know" of the debtor's duty to

a third party in cases where he is required to ignore the debtor's direction to apply the payment to another obligation, there is little logic to requiring such knowledge where no such purported allocation by the debtor is being countermanded. All other things being equal, it is equitable to apply monies having their source in a particular job to the satisfaction of the obligations attributable to that job.

Here Clark agreed to continue doing business with a company owing him $34,450.75 in unsecured debt which it had not been able to pay promptly. During the course of the G.S.A. contract, payments of $66,000 were made out of the proceeds of that contract, more than twice the amount of purchases attributable to it. As a result, the amount owed Clark has been reduced from $34,450.75 to $18,550.27. Clark is certainly in no worse position than it was before the G.S.A. contract began. On the other hand, the surety (and the indemnitor) ought not to be charged with what are essentially outstanding past debts even though the contract on which they agreed to stand surety yielded payments to the supplier twice additional purchases.

Judgment shall enter in favor of the defendants for the reasons stated.

So ordered.