**SILVER HILL CONCRETE CORP. (United States of America for Use and Benefit of Silver Hill Concrete Corp.), Plaintiff,**

v.

**THOMASON INDUSTRIES CORPORATION, Curtin & Johnson, Inc. and Peerless Insurance Company, Defendants.**

Civ. A. No. 81–2542.

United States District Court, District of Columbia.

July 20, 1982.

John I. Heise, Jr., John P. Rhody, Jr., Steven P. Henne, Silver Spring, for Silver Hill Concrete Corp.

Jack Rephan, Washington, D.C., for Thomason Industries Corp. and Peerless Ins. Co.

Leon William Dunn, Jr., Manuel A. Palau, Beltsville, Md., Robert J. Sheridan, Washington, D.C., for Curtin & Johnson, Inc.

## MEMORANDUM

GESELL, District Judge.

This is a Miller Act claim by a materialman arising out of the construction of Pershing Park, a Pennsylvania Avenue Development Corporation (PADC) project. Plaintiff Silver Hill supplied cement to Curtin & Johnson, a first-tier subcontractor of Thomason Industries Corporation. Thomason, the prime contractor for the project, is sued along with Peerless Insurance Company, the surety on the bond. The case was tried to the Court and this Memorandum constitutes the Court's findings of fact and conclusions of law.

The cement was delivered and met all specifications. Thomason paid Curtin & Johnson for the cement through periodic progress payments based on Thomason's receipt of payments from PADC for work completed.

Curtin & Johnson was a long-standing customer of Silver Hill. It purchased large quantities of cement from Silver Hill. It was handling several jobs at the time and directed Silver Hill to deliver cement to each of them. It maintained a running open account with Silver Hill primarily on 60-day credit. Almost every month Curtin & Johnson sent money to Silver Hill in payment for cement. It never designated the job or jobs against which the funds should be applied. Silver Hill using a computerized system always credited the most delinquent accounts first, applying the funds progressively forward against Curtin & Johnson jobs to the extent the money was received. Curtin & Johnson was then advised by return receipt how each periodic payment had been applied.

Curtin & Johnson had contracts on a number of government jobs. During the period in question most of the active jobs being supplied by Silver Hill involved public rather than private work.[1] The company's operations were apparently only marginally profitable and it was often in need of extended credit. During the Pershing Park job Curtin & Johnson lacked credit with some other suppliers of different materials and was unable to purchase its requirements and Thomason made the necessary arrangements so the job could go forward. About the time the Pershing Park job was ending Curtin & Johnson's affairs were winding down and it failed to pay the $70,890.51 which Silver Hill's records showed it still owed Silver Hill for cement used on the Pershing Park job. Curtin & Johnson went out of business and Silver Hill sues Thomason on the bond after timely notice.

Silver Hill argues that these facts lay out a classic claim for recovery under the Miller

---

1. According to records introduced at trial of Curtin & Johnson's account at Silver Hill, between April, 1980, and January, 1981, Silver Hill provided materials to a number of Curtin & Johnson jobs. These were designated by Silver Hill as jobs 1, 5, 8, 9, 13 and 48. Job 9 was the Pershing Park project, which was bonded; jobs 13 and 48 were also bonded government jobs. No evidence was introduced as to whether jobs 1, 5 and 8 were bonded, but these jobs involved much smaller deliveries (in dollar terms) than jobs 9, 13 and 48, and almost no deliveries were made to them after August, 1980.

Act. Defendants Thomason and Peerless assert two defenses. First, they claim Silver Hill is estopped from recovery because it made false representations regarding the status of the Curtin & Johnson accounts, upon which they relied to their detriment. Second, they contend that Silver Hill cannot claim the protection of the Act because it knowingly misapplied funds paid for materials used in the Pershing Park project to other accounts. The Court rejects these defenses for reasons stated below.

Sometime in November of 1980, representatives of Thomason contacted Silver Hill's credit manager by telephone and inquired about the status of the Curtin & Johnson account. According to testimony, Thomason was advised that Curtin & Johnson's accounts were "up-to-date" or "current." Thomason and Peerless assert that this statement was false, that Curtin & Johnson's accounts were in fact substantially overdue at the time and that they relied upon this misrepresentation to their detriment.

Through most of November, Curtin & Johnson's account with Silver Hill was, in fact, current; the terms of the account did not demand payment until 60 days after delivery, and until the end of November there were no accounts more mature than this. Defendants Thomason and Peerless cannot be estopped from pursuing their rights upon the basis of a representation that is true. *United States for the Use of General Electric Supply Co. v. Wiring, Inc.,* 646 F.2d 1037, 1046–47 (5th Cir.1981). Silver Hill at no time misled either Curtin & Johnson or Thomason as to the state of Curtin & Johnson's accounts or the application of payments thereto.

As to the defense of misapplication, the general rule relating to allocation of payments from the prime contractor in Miller Act cases was stated in *St. Paul Fire and Marine Ins. Co. v. United States for the Use of Dakota Elect. Supply Co.,* 309 F.2d 22, 25 (8th Cir.1962), as follows:

(i) The payment is applied as the debtor intends and so manifests to the creditor before or at the time of the payment.

(ii) If the debtor fails so to indicate, the payment is applied as the creditor, within a reasonable time, determines.

(iii) If neither the debtor nor the creditor seasonably so indicates, the payment is applied as a just regard to its effect upon the debtor, the creditor, and third persons makes it desirable that it should be applied. This usually results in its application to the oldest unsecured account.

(iv) If the debtor is under a duty to a third person to devote funds paid by him to the discharge of a particular debt, the payment must be so applied if the creditor knows or has reason to know of that duty. This is so despite the debtor's contrary direction.

*See United States for the Use of Clark-Fontana Paint Co., Inc. v. WIBCO, Inc.,* 396 F.Supp. 1253, 1255 (D.D.C.1975), aff'd, 539 F.2d 243 (D.C.Cir.1976). *See also, United States for the Use of Hyland Electrical Supply Co. v. Franchi Bros. Construction Co.,* 378 F.2d 134 (2d Cir.1967); *United States for the Use of C.H. Benton, Inc. v. Roelof Construction Co.,* 418 F.2d 1328 (9th Cir.1969).

Referring to the tests noted in *St. Paul,* Curtin & Johnson neglected to direct their payments to particular job accounts, although the Silver Hill invoices gave them the opportunity to do so. Rather, Curtin & Johnson sent checks from their general account to cover all of Silver Hill's deliveries. Silver Hill was consequently entitled to apply the payments in a rational manner to all Curtin & Johnson open accounts so long as the application was made "within a reasonable time." Silver Hill had in fact followed a policy of promptly applying undirected payments to the creditor's oldest account for at least several years prior to this suit.

Thus, tests (i), (ii) and (iii) are satisfied. The issue of misapplication turns on (iv). This last exception has frequently been phrased, "[t]he law is well settled that if a [Miller Act] creditor knows or has reason to know that money paid him is received from a particular bonded job, he has the duty to

apply the funds so received from the debtor upon that account," *Roelof, supra,* at 1330. The issue to be addressed thus is: Did Silver Hill apply payments received from the Pershing Park job to other accounts, knowing or having reason to know that the payments had in fact come from the bonded Pershing Park project? Indeed it would defeat the purpose of the Act if suppliers were able to take advantage of the Act by knowingly applying payments received from a bonded job to an unbonded account and thereafter claiming against the bond.

■ The burden of proving misapplication as an affirmative defense in a Miller Act case lies on the party seeking to raise that defense. *Wiring, supra,* at 1037. This does not mean that the party claiming a misapplication is required to trace exact funds; rather, the party must demonstrate by a preponderance of the evidence that a misapplication has in fact occurred. *Wiring, supra,* at 1042–43. Defendants Thomason and Peerless have failed to meet that burden.

■ From April of 1980 to January of 1981, the period over which Silver Hill was delivering materials to Curtin & Johnson at the Pershing Park site, Curtin & Johnson maintained two to four other active accounts with Silver Hill. From May, 1980, until February, 1981, Silver Hill received a series of lump payments from Curtin & Johnson to cover all of these accounts. Substantial amounts of these payments were applied to the Pershing Park account at various times. It does not appear that the percentage of Curtin & Johnson's payments that was applied to the Pershing Park job was disproportionately small, nor that the other projects received inappropriately large allocations as a result of Silver Hill's accounting practice of applying undirected payments to the oldest account.

Moreover, Thomason and Peerless have failed to demonstrate that the series of payments to Silver Hill from Curtin & Johnson in fact derived from monies received from Thomason for the Pershing Park job. The contract between Curtin & Johnson and Thomason required Thomason to pay Curtin & Johnson within seven days of Thomason's receipt of payment from PADC as work progressed to various stages. No evidence was introduced that Silver Hill had any knowledge of when Thomason paid Curtin & Johnson for the cement that Curtin & Johnson bought from Silver Hill. Curtin & Johnson was simultaneously involved in several other large bonded projects. Between April, 1980, and January, 1981, Silver Hill delivered approximately $290,000's worth of material to Curtin & Johnson, of which only $135,000 went to the Pershing Park project. Any of the other projects to which Silver Hill made deliveries might have served as the source of the funds Curtin & Johnson used to pay Silver Hill. As in *Wiring,* under such circumstances "the most that can be said is that it is possible that [some funds] were misapplied. Such a naked possibility falls short of the preponderance of evidence required to be produced...." *Wiring, supra,* at 1043.

Even if Thomason and Peerless had met their burden of proof in showing that Pershing Park funds were in some degree misapplied, they would still have to demonstrate that Silver Hill had applied the funds to other accounts knowing, or having reason to know, that they derived from the Pershing Park project. The evidence does not support such a finding.

First, there is no evidence to indicate that Silver Hill knew which Curtin & Johnson payments were due to monies received from the Pershing Park project, and which payments were due to funds received from the other bonded government projects Curtin & Johnson was engaged in at the time. The checks sent to Silver Hill from Curtin & Johnson were drawn from the general account and bore no notation indicating their source or the account to which they were to be applied. Consequently, Silver Hill had no reason to know that the money paid by Curtin & Johnson at any particular time was "received from a particular bonded job." *Roelof, supra,* at 1330.

Second, Silver Hill had no incentive to misapply funds because almost all of the

Curtin & Johnson projects to which Silver Hill delivered materials during the relevant period were bonded government projects. The rationale behind the defense of misapplication—"that it would be unfair to the principal and the surety on the Miller Act bond to permit a supplier to collect old debts out of monies paid on a current government project, secure in the knowledge that he will be able to collect for the materials furnished on the government project by filing a claim against the bond," *Wiring, supra,* at 1040—does not apply when a supplier would be "misapplying" payments from one bonded account to another bonded account. Silver Hill could not hope to realize any advantage from its accounting practice of crediting undirected payments toward the most delinquent bonded accounts.

Third, Silver Hill's practice of applying payments to the oldest accounts was not an innovation designed to exploit the bond requirements of the Miller Act. Rather, that policy had been in effect for at least several years before Curtin & Johnson embarked on the Pershing Park project. There was testimony at trial that this accounting practice was a standard one in the industry. *See United States for the Use of Jinks Lumber Co. v. Federal Insurance Co.,* 483 F.2d 153, 156 (5th Cir.1973). In any event, the policy appears to have been applied neutrally and consistently to all the Curtin & Johnson accounts over the relevant time period.

Fourth, Silver Hill applied payments to the oldest unpaid account only when creditors did not designate the account to which payments should be allocated. Indeed, Silver Hill gave Curtin & Johnson every opportunity to allocate payments to various accounts; the payment form itself included a space where creditors could designate the exact job toward which payment was being made. Curtin & Johnson refused to use this opportunity. It was at Curtin & Johnson's election, and not Silver Hill's, that Curtin & Johnson's accounts were credited in the fashion disclosed by the record.

In light of these considerations the defendants clearly failed to carry their burden of demonstrating that Silver Hill misapplied payments knowing or having reason to know they were derived from the Pershing Park account. "The purpose of the Miller Act is to protect those who furnish labor and materials for public construction and to ensure that they will be paid for the same." *Graybar Electric Co. v. John A. Volpe Construction Co.,* 387 F.2d 55, 58 (5th Cir.1967), quoting *St. Paul Mercury Indemnity Company v. United States for the Use of H.C. Jones Construction Company,* 238 F.2d 917, 921 (10th Cir.1957). "The Miller Act ... is highly remedial in nature. It is entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects." *United States for the Use of Sherman v. Carter,* 353 U.S. 210, 216, 77 S.Ct. 793, 796, 1 L.Ed.2d 776 (1957).

Thomason may understandably complain that it was not delinquent in paying Curtin & Johnson for the cement. However, it should be noted that Thomason and Peerless were not without means of protecting themselves against loss resulting from Curtin & Johnson's failure to pay Silver Hill for deliveries to the Pershing Park project. The prime contractor could have issued joint checks payable to both Curtin & Johnson and Silver Hill; required Curtin & Johnson to post a bond; made regular inquiries into the state of Curtin & Johnson's accounts at Silver Hill; or simply required Curtin & Johnson to fill out that section of the Silver Hill invoice form allocating payments to the appropriate accounts. Thomason neglected to adopt any of these procedures.

Judgment shall be entered for plaintiff Silver Hill Concrete Corp. against defendants in the amount of $70,890.51, with interest from date of judgment at a rate of 14 percent per annum pursuant to Section 2 of D.C. Act 4–117 (D.C. law 4–70, effective March 10, 1982).